**Bruce N. GLOVER, Plaintiff,**

v.

**WILLIAMSBURG LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, Michael McEvoy, and Barry Campbell, Defendants.**

No. C–1–96–896.

United States District Court,
S.D. Ohio,
Western Division.

May 18, 1998.

Alphonse Adam Gerhardstein, Cincinnati, OH, Jennifer Lynn Branch, a Laufman Rauh & Gerhardstein, Cincinnati, OH, for Plaintiff.

Ralph Gary Winters, McCaslin Imbus & McCaslin, Cincinnati, OH, William M Deters, II, Cincinnati, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

DLOTT, District Judge.

### I. INTRODUCTION

This is a civil rights action in which a public school teacher, Bruce Glover, claims that the decision not to renew his teaching contract at the Williamsburg Local School District was discriminatory. Specifically, Glover claims that he was discriminated against based on his sexual orientation, his gender, and the race of his partner. In addition, Glover contends that the non-renewal amounted to retaliation against him for exercising his right to free speech. The defendants deny these allegations and claim that Glover was not renewed because of deficiencies in his teaching skills. Specifically, the defendants claim that the decision not to renew Glover was based on his inability to effectively manage student behavior.

This case came before the Court in a five-day bench trial. The following opinion constitutes the Court's findings of fact and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### II. BACKGROUND AND FINDINGS OF FACT

#### A. The Parties

The plaintiff, Bruce Glover, is a forty-six year old white man. Glover is gay, and his partner, John Wright, is an African–American man. Glover and Wright have lived together in Mt. Orab, Ohio, for approximately three years. Glover was a first-year teacher at the Williamsburg Elementary School in the 1995–96 school year.

The Williamsburg Local School District ("the District") is located in Clermont County, Ohio. Williamsburg, Ohio is a small, rural community. The District is governed by the Williamsburg Local School District Board of Education ("the Board"), a defendant in this action. The five members of the Board for the 1995–96 school year and all times relevant to this lawsuit were John Croswell (President of the Board), Frank Huddle, Paul Russell, Jan Humphries and Nancy Karlen. During the 1995–96 school year, defendant Michael McEvoy was the Principal of Williamsburg Elementary School and defendant Barry Campbell was Superintendent of the District.

#### B. Glover's Hiring at Williamsburg

After many years of working in the insurance industry, Bruce Glover decided in 1989 that he wanted to enter the teaching profession. Glover enrolled in Wilmington College and worked toward the completion of his requirements for the next five years. He graduated with a teaching degree and certificate in 1993. As part of his degree requirements, Glover was a student teacher for ten weeks at Sardinia Elementary School in Sardinia, Ohio. Following his stint as a student teacher, Glover received excellent evaluations of his teaching performance and potential from both his cooperating teacher and his supervising professor.

During the 1993–94 and 1994–95 school years, Glover worked in several schools, including Williamsburg schools, as a substitute teacher. In 1995, Glover served as a long-term substitute teacher in Williamsburg Elementary School. By all accounts, Glover did an excellent job as a substitute teacher in Williamsburg.

Barry Campbell was serving as Principal of Williamsburg Elementary School during 1994–95, and he also served as the Superintendent of the District for the latter part of that school year. Campbell had occasion to interact with Glover during the time Glover was substitute teaching. Campbell was impressed with Glover's performance as a substitute teacher, describing him as "excellent." In addition, Campbell had received several very favorable written references in support of Glover.[1] In his position as Superinten-

---

1. Among the references submitted by Glover were letters from Kathy Kratzer. Glover's coop- erating teacher during his stint as a student teacher at Sardinia Elementary School. Kratzer

dent, one of Campbell's responsibilities was to recommend teachers to the School Board for employment. When a job opening arose for the 1995–96 school year, Campbell recommended Glover for a full-time teaching position, relying upon Glover's excellent performance and his strong references. Campbell was aware of Glover's sexual orientation at the time he recommended Glover for employment. At the May 1995 School Board meeting, the Board voted to offer Glover a one-year contract to teach at Williamsburg Elementary School for the 1995–96 school year.

## C.  The 1995–96 School Year

### 1.  First Semester

Glover spent the summer of 1995 designing lesson plans in anticipation of the upcoming school year. Glover testified that he spent ten hours a week preparing lesson plans because he was so excited to begin his first full-time teaching job. He was assigned to teach English and Social Studies to the sixth grade.

#### Teacher Evaluation at Williamsburg

There was considerable testimony at trial concerning the procedure for evaluating teachers and making hiring decisions at Williamsburg. At Williamsburg Elementary School, Principal McEvoy was responsible for observing and evaluating teachers whose contracts were up for renewal. As a first-year teacher with a one-year contract, Glover was one of the teachers evaluated by McEvoy. McEvoy would observe teachers in the classroom, taking notes during each observation. These notes would then be used by McEvoy to fill out a standard evaluation form for teachers. On the evaluation form, the teacher would be given a numeric score in several different categories. All staff at Williamsburg Schools received a handbook which listed these seven job performance criteria and described the elements of each criteria. The evaluation form included the

following seven categories: 1) management of instructional time; 2) management of student behavior; 3) instructional presentation; 4) monitoring/feedback; 5) student-teacher interaction; 6) instructional planning; and 7) conformity with professional standards. In each category, the teacher was assigned one of the following numeric scores: 0 = not observed; 1 = poor; 2 = below average; 3 = average; 4 = above average; 5 = excellent.

Principal McEvoy would then use the teacher evaluation in giving his opinion to Superintendent Campbell of the suitability of a teacher for contract renewal. Superintendent Campbell would then make his own determination and present his recommendation to the Board. The Board members would also receive the teacher evaluations and observation notes prepared by McEvoy. The School Board would then make the ultimate decision on whether to renew a teacher's contract.

#### Glover's First Evaluation

Glover received a positive evaluation from McEvoy for the first semester. McEvoy observed Glover's class on two occasions, December 5, 1995 and January 4, 1996. McEvoy's observation notes included many positive comments, and McEvoy testified that he was impressed with Glover's teaching. Glover's lessons were "well-organized" and "purposeful," and the students were "quiet and focused." McEvoy gave Glover the following scores on his first semester evaluation form:

Management of Instructional Time—4

Management of Student Behavior—2

Instructional Presentation—4

Monitoring/Feedback—4

Student–Teacher Interaction—3

Instructional Planning—5

Conformity with Professional Standards—1 (later changed to 4)

described Glover as a "very capable and dedicated teacher" with many strengths, including his sensitivity to student needs, his use of effective classroom management techniques, and his ability to establish an excellent rapport with both students and parents. Other references were similarly complimentary. John Burton, a profes-

sor at Wilmington College, observed Glover's student teaching and commented that Glover's strengths included his creativity and excellent planning and preparation. Burton also stated that despite being a student teacher, Glover "exhibited the teaching skills and characteristics of a veteran and effective teacher."

Thus, Glover's scores were generally above average, although he received below average scores for managing student behavior and for conformity with professional standards. McEvoy testified that he gave Glover a below average rating for behavior management because he thought that Glover was too quick to use the discipline technique of sending students to the Principal's office. McEvoy preferred Glover to develop disciplinary approaches by which he could manage behavioral problems without sending kids to McEvoy's office.

McEvoy's positive reviews were consistent with the impressions of other teachers at Williamsburg who taught in close proximity to Glover's classroom. Janice Bauer taught in the gifted program, and her classroom was next door to Glover's. Bauer testified that she entered Glover's classroom for short periods of time approximately once a week, and thus she had an opportunity to observe Glover's teaching. Bauer was impressed with Glover's creative lesson plans and his ability to keep kids "on task." She noted that Glover's class was well-run and that for the entire year she never heard any disruptions or yelling coming from Glover's adjacent classroom. Ava Blair was a sixth grade teacher whose classroom was across the hall from Glover's. Blair also testified that she never heard disruptions coming from Glover's classroom.

### The False Rumor

The lowest mark received by Glover in his first semester evaluation was in the category of conformity to professional standards. On the evaluation form, McEvoy added a comment to explain the low score: "Mr. Glover has used some indiscretions which may have had a detrimental effect on the respect he receives from students. He was warned at the beginning of the school year not to repeat such behavior." In fact, Glover had never received any warning and he had committed no indiscretion whatsoever. The low

score was based on a false rumor which had been relayed to McEvoy. The rumor involved Glover and his partner, John Wright, allegedly holding hands at school during a holiday party.

Superintendent Campbell testified that he first heard the rumor when a woman phoned him in early January, 1996. The woman was concerned because she had heard that Glover and Wright were holding hands at school during the sixth grade Christmas party. There had in fact been a Christmas party in December, and Glover had invited several adults, including Wright, to help out with the party. Other teachers at Williamsburg had also invited friends and spouses to help out at holiday parties and other school events.[2] Wright attended the party briefly to help with festivities and then left. At no time did Glover and Wright hold hands.[3]

After receiving the phone call, Campbell reported the rumor to McEvoy. The testimony of Campbell and McEvoy conflicted over exactly how the information was presented to McEvoy.[4] According to McEvoy, Campbell was upset when he reported the complaint to McEvoy, and Campbell presented it as the truth, not as a rumor. McEvoy then incorporated the alleged indiscretion into Glover's evaluation, giving him a rating of "poor" for conformity with professional standards. Neither Campbell nor McEvoy checked out the rumor or asked Glover about it.

On January 10, 1996, Glover met with McEvoy to review his first semester evaluation. Upon seeing the low mark for unidentified "indiscretions," Glover was understandably concerned and he asked McEvoy to explain. McEvoy told Glover that the low mark was due to his holding hands with Mr. Wright during the holiday party. Although Glover asked where McEvoy had heard the rumor, McEvoy would not reveal the source of the information. McEvoy told Glover that

---

**2.** Campbell testified that teachers are permitted to bring friends and spouses to school to help out with holiday events, and that no teacher had ever been disciplined for doing so.

**3.** Glover testified that he believes it is generally inappropriate to engage in public displays of

physical affection, such as kissing or hand-holding, and that he never does so.

**4.** Campbell testified that he told McEvoy that the hand-holding was a rumor and that he asked McEvoy to find out if it was true.

Mr. Wright was not to come to the school again. Glover protested that the hand-holding did not occur, and he urged McEvoy to speak with other adults who had attended the party.

Later, Glover asked for a meeting with McEvoy to further discuss the rumor and the low mark on his evaluation. A couple of weeks later, this meeting occurred with McEvoy, Campbell, Glover, and Kurt Blimline, a representative of the teachers union. In the interim, McEvoy had contacted certain parents who had attended the party, and he discovered that the rumor was false. Thus, McEvoy and Campbell informed Glover at the meeting that his evaluation would be revised. Glover asked Campbell for the name of the person who had reported the rumor, but Campbell refused to give the name.[5] McEvoy ultimately revised Glover's teaching evaluation, giving Glover a "4" for conformity with professional standards. McEvoy removed the earlier comment about Glover's "indiscretions" and the fact the Glover had been warned not to repeat such behavior.

At the meeting, however, Campbell and McEvoy did not merely revise the evaluation to correct their earlier mistake. They also made efforts to warn Glover about his behavior. McEvoy and Campbell cautioned Glover about how easily rumors can start in a small, conservative community like Williamsburg. Although the hand-holding rumor was untrue, Campbell and McEvoy warned Glover to be careful not to do anything which might fuel rumors and upset the community.[6]

McEvoy was not the only person to whom Campbell reported the alleged indiscretion. Sometime in early January, Campbell reported the incident to School Board, which was meeting in executive session.[7] The exact date is unclear, but the meeting occurred after Campbell received the complaint about Glover and before the rumor was found to be untrue. Jan Humphries, a Board member, testified that Campbell told the Board he had received a complaint about Mr. Wright being in Glover's classroom during the holiday party. Other Board members had also heard of the rumor about Wright visiting the classroom, and people were "stirred up" about the incident. Campbell told the Board he had received some complaints and would check it out. Despite subsequently learning that the rumor was false, Campbell never reported back to the Board about the incident.

## 2. Second Semester

In the second semester, McEvoy increased his observations of Glover's teaching. Instead of conducting the required two observations per semester (as was done in the first semester), McEvoy made six observations. It appears that McEvoy's increased observations were motivated at least in part by a complaint he received from Board Member Jan Humphries. Humphries had a son in Glover's class who reported to her that the class was unruly. At some point early in the second semester, Humphries complained about this to McEvoy. The master contract for the Williamsburg School District provides that the Principal, upon hearing a concern from someone in the community, will notify the teacher of the nature of the concern and the identity of the concerned party.[8] The teacher can then request a meeting with the Principal and the complainant to resolve the conflict. However, as when McEvoy heard the rumor regarding Glover's alleged indiscretion, McEvoy failed to follow this procedure and notify Glover. McEvoy failed to inform Glover of the complaint despite the

---

5. Campbell testified that he had noted the complainant's name and called her back to report that the rumor was unfounded. However, Campbell was unable to recall the woman's name at trial.

6. According to Glover, McEvoy told Glover that people in the community might be concerned if Glover had to stay after school alone with a male student. Campbell also warned Glover that he had better be careful because there was a small group of parents that was out to get him.

7. All Board members attended this January meeting, with the possible exception of Frank Huddle.

8. *See* Master Contract between the Williamsburg Education Association and the Williamsburg Local School District Board of Education, Public Complaint Procedure, § 5.07.

fact that the complaining parent was also a member of the School Board.

After completing his observations, McEvoy produced a teaching evaluation for Glover for the second semester. Glover's scores dropped from the first semester evaluation:

Management of Instructional Time—2

Management of Student Behavior—2

Instructional Presentation—2

Monitoring/Feedback—2

Student–Teacher Interaction—4

Instructional Planning—3

Conformity with Professional Standards—5

On March 28, 1996, McEvoy met with Glover to discuss the second evaluation. Although Glover's evaluation was less favorable than in the first semester, McEvoy told Glover that he would recommended to Superintendent Campbell that Glover's contract be renewed. Campbell, however, decided that his recommendation to the Board would be that Glover not be renewed.

### 3. Theresa Whiteman

At trial, evidence was introduced with regard to another teacher at Williamsburg Elementary whose contract was up for renewal in 1996. Theresa Whiteman is a white, heterosexual woman who, like Glover, was serving in her probationary year at Williamsburg in the 1995–96 school year. Whiteman was ultimately renewed for the 1996–97 school year, and she replaced Glover as the sixth grade English and Social Studies teacher. Glover contends that Whiteman had weaker evaluations and worse teaching skills than Glover, and that there was no professional, nondiscriminatory reason to renew her teaching contract rather than his.

As he did with Glover, McEvoy observed Whiteman's classroom and prepared teaching evaluations for the first and second semester. Whiteman's evaluations were in fact worse than Glover's and were described by Campbell as "very, very bad." Whiteman received the following scores on her first and second semester evaluations:

| Category | 1st Semester | 2nd Semester |
|---|---|---|
| Management of Instructional Time | 2 | 3 |
| Management of Student Behavior | 1 | 2 |
| Instructional Presentation | 2 | 2 |
| Monitoring/Feedback | 3 | 3 |
| Student–Teacher Interaction | 1 | 2 |
| Instructional Planning | 2 | 2 |
| Conformity with Professional Standards | 3 | 4 |

Thus, Whiteman's scores were lower overall than Glover's in both semesters.[9] In particular, Whiteman received a worse evaluation than Glover in the area of management of student behavior, as reflected in both the numeric scores and McEvoy's comments.[10]

McEvoy testified that he had concerns with Whiteman's ability to manage classroom behavior. In fact, at one point there was a major disturbance in Whiteman's classroom which resulted in a child being injured and taken to a hospital for treatment. Despite his concerns, McEvoy ultimately recommended to Campbell that Whiteman be renewed with a one-year probationary contract. Campbell in turn decided, as he had with Glover, to recommend to the Board that Whiteman not be renewed.

### 4. The School Board's Decision Not to Renew Glover's Contract

After receiving Campbell's recommendations regarding the renewal of teachers' contracts, the Board made the final decision in a series of meetings in the Spring of 1996. On April 15, 1996, the Board held a meeting at which the nonrenewal of Glover and Whiteman was on the agenda. The two teachers were invited to address the Board, and they were given the option of speaking to the Board during the public meeting or privately in executive session. Whiteman chose to speak privately to the Board during executive session.

---

**9.** On her first evaluation, Whiteman averaged a score of 2.0 on a scale of 5.0, while Glover's average was 3.7. In the second semester, Whiteman averaged 2.6, compared to 2.9 for Glover.

**10.** In giving Whiteman the lowest possible score for managing student behavior, McEvoy made

several comments on her first evaluation: "Miss Whiteman is either not assertive enough or too assertive. Negative comments or 'put-downs' are counterproductive! Miss Whiteman needs to be more purposeful, assured and organized in the classroom—focus on instruction."

Glover chose to address the Board publicly. The meeting was unusually well-attended for a School Board meeting, and television cameras were present during the meeting.[11] In his public statement to the Board, Glover stated that he believed that the unfounded rumor affected his evaluations and "started the trouble" which led to the steep decline in his second semester scores. When asked by Board President Croswell whether he believed his nonrenewal was a "sexual preference issue," Glover responded that he did believe it was sexual orientation discrimination.

Glover also discussed his ability to manage student behavior. He defended himself on this issue, acknowledging that he had a problem with discipline but explaining how he had worked with Ava Blair, his informal mentor, to solve it.[12] Glover was also critical of McEvoy's inability to assist him in that regard.[13] According to testimony at trial, Board President Croswell was agitated and upset with Glover and questioned Glover harshly during the meeting. Several Board members testified that they disapproved of Glover criticizing Principal McEvoy in a public fashion. At the close of the April meeting, the Board voted not to renew the contracts of both Whiteman and Glover.

On May 20, 1996, the Board held an appeals hearing in executive session on the nonrenewal of Whiteman and Glover. Both Glover and Whiteman were given an opportunity to present an appeal to the Board. At the hearing, Glover was represented by an attorney from the Ohio Education Association and called witnesses on his own behalf. The hearing lasted for many hours and did not conclude until after 3:00 a.m. The Board decided to reconvene on May 24, 1996 for the final vote on the teachers' appeals. On May 24, the Board's initial decision not to renew Whiteman's contract was reversed, and the Board granted Whiteman a new contract. As for Glover, the Board voted unanimously to affirm its decision not to renew his contract. Board member Russell read a statement to the press following the meeting which stated that the reason for Glover's nonrenewal was his inability to manage student behavior in the classroom.

At trial, Board members Croswell, Humphries, Karlen and Russell all testified regarding the decision not to renew Glover's teaching contract. When asked the reason for their decision, each Board member denied that the decision was based on Glover's sexual orientation, his gender, or the race of his partner, Mr. Wright. The Board members also denied that the decision was motivated by Glover's public statement that he believed he was the victim of sexual orientation discrimination.

Several Board members' stated that their decision concerning Glover was related to the issue of student behavior management. However, Board members also gave several additional reasons for the decision. For example, Humphries testified that she voted against Glover because he had criticized McEvoy at the April hearing, and she "didn't think it was good to have a teacher who would publicly slam the administration." Russell echoed this sentiment, stating that he was reluctant to renew Glover because he had "bad-mouthed McEvoy." Board members also listed Glover's failure to acknowledge his deficiencies as a reason for the nonrenewal. In contrast to Glover, the Board members testified that Whiteman seemed willing to work to improve her teaching skills.

11. Some time after the April 15 meeting, the news media contacted Glover about the situation. Glover gave an interview which appeared on local television news in early May.

12. Under the arrangement with Blair, an experienced teacher at Williamsburg, a disruptive student would be removed from Glover's class and sent for a "time-out" to Blair's classroom until he or she was well-behaved enough to return to class. Glover and Blair employed this technique a few times, although the practice had ceased by the end of the school year. McEvoy and others testified at trial that this is an effective discipline technique.

13. Glover said that he had sent kids to McEvoy's office a few times for misbehaving, and they had been sent back to Glover's room with a letter of apology. Glover said that he considered this to be an ineffective disciplinary approach, and he had lost some faith in McEvoy. As a result, Glover said that he stopped sending students to McEvoy's office and instead worked out the arrangement with Ava Blair.

Although Glover was upset about his non-renewal, he finished the year in a professional manner. Glover has not found a permanent teaching position since the nonrenewal of his contract by Williamsburg in 1996, although he has applied for teaching jobs in various nearby school districts.

## III. CONCLUSIONS OF LAW

### A. *The Claims*

All of Glover's claims arise from the decision of the Board not to renew his teaching contract. The federal claims are based on violations of two provisions of the United States Constitution: the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. These claims are brought pursuant to 42 U.S.C. § 1983, which prohibits the deprivation of federal rights by those acting under the color of state law. Glover also contends that the discriminatory decision of the Board violates the Ohio Civil Rights Act.[14] The legal standards for these claims are outlined below.

■ As a preliminary matter, it should be noted that in order to prevail on his § 1983 claims of constitutional violations, Glover must show that the Board members themselves discriminated against him in their decision not to renew his contract. A municipality may be held liable under § 1983 only for official policies or customs which are adopted by officials with final policy-making authority. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The question of final policy-making authority is one of state law, and Ohio law states that a board of education has final authority to establish employment policy and make contract renewal and nonrenewal decisions. *See Justus v. Brown,* 42 Ohio St.2d 53, 325 N.E.2d 884 (1975); *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education,* 926 F.2d 505, 515 (6th Cir.1991).

In the present case, Principal McEvoy evaluated Glover, and Superintendent Campbell made the nonrenewal recommendation to the Board, but neither had final decision-making authority for purposes of § 1983. Proving that either McEvoy or Campbell intended to discriminate against Glover would therefore be insufficient by itself to establish municipal liability. *See Hull,* 926 F.2d at 515–16 (stating that even if the superintendent's nonrenewal recommendation to the school board was discriminatory, no § 1983 violation occurs unless the plaintiff can prove discrimination by the board members). In order for Glover to prevail, he must show that the Board discriminated against him when they voted not to renew his contract.

### 1. Equal Protection Claims

Glover maintains that the non-renewal decision violated the Equal Protection Clause because the Board discriminated against him on the basis of his sexual orientation, his gender, and the race of his partner. The defendants deny that the decision was motivated by bias, claiming that Glover was not renewed because of a deficiency in his teaching, specifically his inability to manage student behavior.

■ The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, the threshold element of an equal protection claim is disparate treatment. Once disparate treatment is shown, the legal standard for analyzing an equal protection claim depends upon the classification used by the government decision-makers.

■ There are essentially three levels of scrutiny which courts apply to such claims, each of which is potentially implicated in this case: strict scrutiny, intermediate scrutiny and rational basis review. Decisions based upon race invoke strict scrutiny: the govern-

---

**14.** The Court exercises pendent jurisdiction over this state law claim which arises from the same facts as Glover's equal protection claim. *See* 28 U.S.C. § 1367; *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

ment action must be narrowly tailored to serve a compelling state interest. *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. Gender classifications invoke the intermediate level of scrutiny: the action must be substantially related to an important government interest. *Id.* at 440–41, 105 S.Ct. 3249. Sexual orientation classifications (and all other classifications which are not considered "suspect" or "quasi-suspect") receive the lowest level of scrutiny: they need only be rationally related to a legitimate state purpose. Regardless of the level of scrutiny, only intentional, purposeful discrimination violates the Equal Protection Clause. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Copeland v. Machulis,* 57 F.3d 476, 481 (6th Cir.1995).

### Sexual Orientation Discrimination

The parties disagree on the extent to which the Constitution prohibits sexual orientation discrimination, and thus the Court will briefly address this issue. Defendants contend that the Equal Protection Clause simply does not prohibit discrimination based on sexual orientation,[15] citing *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). However, *Bowers* held only that there is no substantive due process right to engage in homosexual sodomy, and the Court expressly declined to consider an equal protection claim. *Bowers,* 478 U.S. at 196 n. 8, 106 S.Ct. 2841; *see Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997) ("It is inconceivable that *Bowers* stands for the proposition that the state may discriminate against individuals on the basis of their sexual orientation."). Recently, both the Supreme Court and the Sixth Circuit have applied the "rational relationship" test to analyze equal protection claims of government discrimination against homosexuals. *See Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating a state constitutional amendment which was found to have no rational relationship to any legitimate state interest); *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati,* 128 F.3d 289 (6th Cir.1997) (ap-

plying the rational relationship test to uphold a city charter amendment); *Stemler,* 126 F.3d at 873–74 (applying rational relationship test to analyze a claim that the plaintiff was selectively prosecuted because of her perceived sexual orientation).

▮ Homosexuals, while not a "suspect class" for equal protection analysis, are entitled to at least the same protection as any other identifiable group which is subject to disparate treatment by the state. *See Stemler,* 126 F.3d at 874 ("[T]he principle would be the same if Stemler had been arrested discriminatorily based on her hair color, her college bumper sticker ... or her affiliation with a disfavored sorority or company."). Furthermore, a state action which discriminates against homosexuals and is motivated solely by animus towards that group necessarily violates the Equal Protection Clause, because a "desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose." *Stemler,* 126 F.3d at 874 (citing *Romer v. Evans,* 116 S.Ct. at 1629); *Romer,* 116 S.Ct. at 1628 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.") (quoting *Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)).

### 2. Ohio Civil Rights Act

▮ Glover contends that the same facts which give rise to his equal protection claim also state a claim under the Ohio Civil Rights Act. *See* Ohio Rev.Code § 4112. The Ohio statute prohibits employment discrimination on the basis of one's gender or race, but does not include sexual orientation among its protections. *See Greenwood v. Taft, Stettinius & Hollister,* 105 Ohio App.3d 295, 663 N.E.2d 1030 (1995). The standards of proof under Ohio law are identical to those under Title VII of the Civil Rights Act of 1964, the federal employment discrimination

---

**15.** "Neither the equal protection clause of the Fourteenth Amendment nor Ohio Revised Code Chapter 4112 prohibits discrimination based on

sexual orientation." Defendants' Proposed Findings of Fact and Conclusions of Law, at 9.

statute. *See Plumbers and Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981).

### The Framework for Proving Intentional Discrimination

■ Title VII case law has established a framework for analyzing claims of intentional employment discrimination. This framework can also be used to analyze equal protection claims brought pursuant to 42 U.S.C. § 1983, as well as claims under the Ohio Civil Rights Act. *See Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988); *Kitchen v. Chippewa Valley Schools,* 825 F.2d 1004, 1011 (6th Cir .1987); *Plumbers and Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981). Thus, Glover's discrimination claims, which are brought pursuant to both Ohio law and the Equal Protection Clause, can be analyzed under the Title VII framework. This is not surprising since the ultimate issue under Ohio law, Title VII, and the Equal Protection Clause is whether the plaintiff can prove by a preponderance of the evidence that he was the victim of intentional discrimination. *See Gutzwiller,* 860 F.2d at 1325; *Kitchen,* 825 F.2d at 1011.

The established framework for deciding employment discrimination cases involves three stages of proof with shifting evidentiary burdens. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, the plaintiff must establish a prima facie case of discrimination. In this case, Glover has established a prima facie case by showing: 1) he is in a protected class; [16] 2) that he was qualified for the job for which the employer was seeking applicants; 3) that he was rejected; and 4) that he was replaced by someone outside the protected class. *See St. Mary's Honor Center v.. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The defendants in this case have met this burden by claiming that Glover's nonrenewal was based upon his inability to manage student behavior. Finally, if the defendant puts forth a legitimate, nondiscriminatory reason, then the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely pretext for illegal discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089 (1981). Thus, the present case turns on whether Glover can prove that the defendants' proffered reason for his nonrenewal was pretextual and the true reason was his sexual orientation, his gender, or the race of his partner.

### 3. First Amendment Claim

Glover also claims that the Board's decision not to renew his contract constituted unconstitutional retaliation against him for exercising his First Amendment right to speak on a matter of public concern. Glover contends that the Board retaliated against him for speaking publicly at the April Board meeting about discrimination in the Williamsburg School District.

■ Retaliation for the exercise of one's constitutional right to speak out on matters of public concern constitutes a First Amendment violation. *See, e.g., Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Zilich v. Longo,* 34 F.3d 359, 364 (6th Cir. 1994) *cert. denied,* 514 U.S. 1036, 115 S.Ct. 1400, 131 L.Ed.2d 288 (1995) ("Retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment."). When the claim is brought by a public employee, the determination of whether the plaintiff has suffered a constitutional deprivation requires a two-step process. *See Rahn v. Drake Center, Inc.,* 31

---

**16.** As noted above, the Equal Protection Clause applies to Glover's claims based on gender, race and sexual orientation, while the Ohio Civil Rights Act covers only the race and gender claims.

F.3d 407, 411 (6th Cir.1994); *Bailey v. Floyd County Board of Education*, 106 F.3d 135, 144 (6th Cir.1997). First, the employee must establish that the speech was constitutionally protected. *Rahn*, 31 F.3d at 411; *Bailey*, 106 F.3d at 144. Speech is protected in this context if it addresses a matter of public concern, and if the employee's interest in making such statements outweighs the state's interest as an employer in providing efficient public services. Second, if the plaintiff can demonstrate that the speech is protected, the plaintiff has the burden of showing that the speech was a "substantial" or "motivating" factor in the employer's decision. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568.

## B. Analysis of Glover's Claims

Having explored the applicable legal standards, the Court will now address whether Glover succeeded in proving his claims at trial. Critical to this case is the motivation of the members of the Board when they voted not to renew Glover's contract. At the time of the decision, the Board stated that the reason for the nonrenewal was Glover's inability to effectively manage student behavior. Glover contends that this reason is pretextual and that in fact the Board discriminated against him because of his homosexuality, his male gender, the race of Mr. Wright, and the fact that he publicly criticized the Board for engaging in sexual orientation discrimination.

## 1. Sexual Orientation Discrimination

### a. McEvoy and Campbell

It is helpful to review first the actions of McEvoy and Campbell, which provide the background to the Board's nonrenewal decision. The evidence revealed that the behavior of McEvoy and Campbell was at times unprofessional, and it can be inferred that they would have acted differently if Glover were not homosexual. Their response to the hand-holding rumor is illustrative. First, Campbell received the complaint about a single incident in which Glover allegedly held hands with Mr. Wright at school. Campbell passed along the rumor to McEvoy, both of whom assumed the reported "indiscretion" to be true. Neither approached Glover to discuss the complaint, as specified in the procedures for Williamsburg schools, and in fact Campbell refused to identify the complainant when asked by Glover. If either McEvoy or Campbell had followed school procedures and discussed the allegation with Glover, it is likely that the matter would have been resolved quickly and without incident.

Instead, McEvoy accepted the rumor as true and considered it a serious enough indiscretion to incorporate it as the worst mark on Glover's formal teaching evaluation. Meanwhile, Campbell, upset about the indiscretion, reported the incident to the Board and promised he would check it out. Despite having informed the Board of a complaint serious enough to affect Glover's teaching evaluation, Campbell never reported back to the Board to explain that the rumor was unfounded.

The questionable behavior of McEvoy and Campbell did not cease once the rumor was discovered to be false. In a meeting with Glover, they agreed to revise the evaluation. They proceeded, however, to warn Glover about his behavior, despite the fact that the very purpose of the meeting was to acknowledge that Glover had never behaved improperly. In fact, it was Campbell and McEvoy who had erred when they repeated a false rumor and used the information on Glover's evaluation without informing Glover or verifying the information. Glover was also told at the meeting that Mr. Wright was not to return to the school, although it was customary at Williamsburg for adult acquaintances of teachers to visit the school. Finally, following the incident of the false rumor and redacted evaluation, the scores on Glover's teaching evaluation dropped dramatically. This decline is at least suspicious, in light of its timing and magnitude, and Glover contends that it reflects a discriminatory attitude toward Glover as a gay teacher.

### b. The Board

Although the actions of McEvoy and Campbell are important to understand the context for the nonrenewal decision, it is the Board's motivation which is critical to Glo-

ver's case. After listening to the testimony of the Board members and reviewing the information available to the Board at the time of the nonrenewal decision, the Court agrees with Glover that the purported reason for his nonrenewal was pretextual. As explained below, the Court found the testimony of the Board members to be contradictory and not entirely credible. Based upon all the evidence presented at trial, the Court is convinced that the Board did in fact discriminate against Glover based upon his sexual orientation when it decided not to renew his teaching contract.

### Behavior Management as Pretext

Although the Board members stated that behavior management was the reason for Glover's nonrenewal, this justification does not ring true in light of the comparison of Glover to Theresa Whiteman. The Board considered Whiteman for renewal at the same time as Glover, and the Board decided to renew Whiteman, thereby replacing Glover as a sixth grade teacher. Comparing the scores on the teaching evaluations, which Board members reviewed in making their decisions, one finds that Glover's evaluations were superior to Whiteman's in both semesters. In the first semester, Glover's evaluation was considerably better than Whiteman's.

The decision to renew Whiteman rather than Glover is particularly curious in light of the purported reason for Glover's nonrenewal: management of student behavior. There was testimony at trial that behavior management is a common problem for first-year teachers, and thus it is not surprising or unusual that both Glover and Whiteman had difficulty in this area. Both teachers were below average with respect to management of student behavior. According to the evaluations, however, Whiteman was worse, per-

haps illustrated by the incident in which a student was injured in her class. Whiteman received ratings of "poor" and "below average" while Glover was rated "below average" both semesters. In addition to the evaluations, the Board had additional information concerning Glover's ability to manage classroom behavior. McEvoy's observation notes for the second semester reveal that Glover employed a variety of disciplinary approaches, in accordance with McEvoy's earlier suggestion. The Board also heard testimony at the May hearing from Ava Blair, who stated that she had never heard disruptions from Glover's classroom, which was directly across the hall from her own.

At trial, Glover introduced testimony from Dr. Milton Ploghoft which supported the argument that the Board's purported reason for Glover's nonrenewal was pretextual. Ploghoft is an expert in the training and evaluation of elementary school teachers in Ohio. He reviewed McEvoy's observation notes and the teacher evaluations for Glover and Whiteman, the same information available to the Board when it made the renewal decisions. Ploghoft concluded that there was no professional reason to treat Glover worse than Whiteman. The Court agrees.

Furthermore, although the Board repeatedly and publicly took the position that the sole reason for Glover's nonrenewal was management of student behavior, the rationale for the decision shifted at trial, where Board members articulated different reasons. For example, Humphries stated that she voted against Glover because he had "publicly slammed" McEvoy at the April hearing.[17] Russell and other Board members echoed this sentiment, voicing concerns about Glover's ability to work effectively with the school administration.[18] Several Board members also stated that a reason for Glo-

---

17. The Court notes that Humphries acted unprofessionally in failing to properly manage her dual role as a Board member as well as the parent of a student in Glover's class. She complained to McEvoy about Glover's class, based upon information she heard from her son. Yet despite having some personal knowledge of Glover's class and lodging a complaint, she never disclosed this to Board (or to Glover) when voting on his nonrenewal.

18. The evidence at trial indicated that Glover's criticism of McEvoy were made in good faith, and that any fears about Glover's ability to work well with McEvoy were unfounded. In fact, McEvoy himself testified that he did not think it was improper for Glover to point out the deficiencies in McEvoy's supervision of Glover, and that he would have expected Glover to act professionally and respect his colleagues if he had been renewed.

ver's nonrenewal was his failure to acknowledge any deficiencies in his teaching or demonstrate a willingness to improve. As pointed out by Glover, however, the evaluations and observation notes revealed otherwise.[19] In sum, in light of the information available to the Board and the other evidence of this case, the Court finds that the defendants have failed to establish a credible reason for renewing Whiteman over Glover.

### Other Evidence to Support an Inference of Discrimination

In addition to the evidence described above, conflicting testimony from various Board members further convinced the Court that the true motivation for the Board's decision not to renew Glover was his sexual orientation. For example, the Board members contradicted each other regarding when the Board was first informed that Glover was gay and whether the Board ever discussed Glover's homosexuality. Humphries testified that the Board knew Glover was gay in January 1996 at the latest.[20] Campbell reported to the Board in executive session about the complaint regarding Mr. Wright being in Glover's classroom. The presence of another adult in school would not normally be a cause of concern. Mr. Wright's presence at school was considered by the Board to be a complaint because rumors were circulating that Glover was gay and people were stirred up about the incident. According to Humphries, other Board members had heard the rumor about Glover and Wright prior to Campbell's report.

Thus, there was evidence that the Board was informed in January 1996 that Glover was gay and that there was a complaint concerning Mr. Wright, Glover's partner. A Board discussion about a gay teacher acting inappropriately with his partner at school was certainly an unusual occurrence, one which a Board member would be unlikely to forget. This issue would have been particularly noteworthy if people were stirred up by the rumors in the community, rumors which had reached the ears of Board members. Yet two other Board members, Russell and Karlen, testified that they were unaware of Glover's sexual orientation until April 1996, just prior to the April Board meeting.[21] It is impossible to know why the Board members' testimony was contradictory on this point. At the very least, however, this testimony calls into question the credibility of some of the Board members on an important issue: if and when the Board ever discussed the fact that Glover is homosexual.

Finally, despite being aware of rumors and complaints about Glover's homosexuality, the Board never gave any credence to Glover's claim of sexual orientation discrimination. Board President Croswell testified that he received several calls in 1995–96 from people in the community who were concerned about the fact that Glover was gay. Moreover, the entire Board was informed in the May hearing of how an unfounded rumor (the same complaint reported by Campbell to the Board in January) had been used to lower Glover's first evaluation. The Board was also aware that within only a few months after this incident, Glover's teaching evaluation declined sharply from "above average" and "excellent" to mostly "below average."[22] These

19. On his first evaluation, Glover acknowledged in writing that he needed to improve in classroom management. On the second semester evaluation, McEvoy commented, "Mr. Glover has been very willing to perform extra duties and strives for professional development." Glover also followed McEvoy's suggestion to read certain books on teaching and to develop techniques for managing student behavior. Again, this was reflected in the information before the Board, since McEvoy's observation notes recounted a variety of disciplinary tactics employed by Glover.

20. There was some testimony that the Board knew Glover was gay in May 1995. Campbell testified that he told the Board in May 1995, that

the teacher he was recommending, namely Glover, was gay, but that the teacher would be discreet. Board member Karlen remembered being told of a gay teacher in May 1995, but she stated that she did not realize at the time that this teacher was Glover.

21. Russell also testified at trial that he believed a school board could legally discriminate against a teacher based on sexual orientation, although he denied doing so in this case.

22. Dr. Ploghoft described as a "mystery" the fact that the evaluations represented such a quick and drastic decline in basic teaching skills which Glover had demonstrated in the first semester.

facts together could reasonably have prompted the Board to at least explore why Glover felt he was being discriminated against or to raise questions about McEvoy's evaluation. Yet no Board member took any action to inquire whether Glover's contention had any merit. Although the failure to investigate Glover's charge is not by itself strong evidence of discrimination, it calls into question the credibility of various Board members' statements that they would never tolerate discrimination.

The Court finds that the evidence, taken together, demonstrates that the Board's purported reason for Glover's nonrenewal was pretextual, and in fact the Board discriminated against Glover on the basis of his sexual orientation. The Court can only speculate as to exactly why the Board acted as it did. Perhaps the Board feared that a gay teacher would act inappropriately or somehow be a trouble-maker. Or perhaps the Board was responding to perceived disapproval in the community of having a gay teacher at Williamsburg. Regardless of the Board's reasoning, Glover had established that he was an above average first-year teacher who was more qualified than the woman chosen by the Board to replace him. This fact was evident to the Board from the evaluation and observation material they were given in the decision-making process. In fact, this material revealed that Glover performed better than Whiteman in managing student behavior, the purported reason for his nonrenewal. Glover's successful showing of pretext, together with the other evidence introduced at trial, supports a finding that the Board's decision was motivated by animus towards him as a homosexual.

The defendants have argued that Glover has no direct proof that the Board intended to discriminate against him for being homosexual. However, in discrimination cases, where the ultimate issue is the defendant's intent, it is rare that a decision-maker will admit to discriminating and it is impossible to get inside the decision-maker's mind. As the Sixth Circuit recently stated:

> Rarely can discriminatory intent be ascertained through direct evidence because rarely is such evidence available. This is the reason for the McDonnell Douglas–Burdine burden of proof mechanism, allowing a plaintiff to prove its case through circumstantial evidence ... [T]hus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof.

*Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997); *see also United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Therefore, the fact that Glover lacked a "smoking gun" statement by the Board and proved his case by indirect evidence of discrimination is far from fatal to Glover's case. It is in fact the norm.

Having proven that the Board's nonrenewal decision was motivated by animus, Glover has established his equal protection claim. For purposes of a rational review analysis of the decision, the defendants did not present any evidence at trial to support a legitimate rationale for discriminating against homosexual teachers.[23] As noted above, their position was that no discrimination occurred. However, since the Board was motivated by animus towards Glover as a homosexual, Glover necessarily prevails under a rational basis review of the Board's decision. "[S]ince governmental action 'must bear a rational relationship to a legitimate governmental purpose,' and the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, a state action based on that animus alone violates the Equal Protection Clause." *Stemler v. City of*

---

23. Although no evidence on this point was presented at trial, the defendants did include the following argument in their summary judgment and post-trial briefs: "While defendants deny that Glover's homosexuality played any role in the decision not to renew his contract, it is clear that a board of education could, consistent with the rational relationship test, conclude that homosexuality is morally objectionable to a substantial number of persons in the community, and might create such tensions and hostilities which would undermine the ability of a homosexual to be an effective teacher." Defendants' Proposed Findings of Fact and Conclusions of Law, at 10.

*Florence,* 126 F.3d 856, 873–74 (6th Cir.1997) (quoting *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855 (1996)).

## 2. Race and Gender Discrimination

■ Although Glover prevails on his claim of sexual orientation discrimination, he has failed to produce sufficient evidence to support his claim that the Board's decision was motivated by his gender or the race of his partner.[24] While it is possible that the Board was aware that Mr. Wright is African-American, Glover did not introduce sufficient evidence to infer that the Board's decision was motivated by racial discrimination. Since Glover has not proven that any defendant engaged in racial or gender discrimination, his claims under the Ohio Civil Rights Act similarly fail.

## 3. First Amendment Claim

■ The Court also finds that Glover has failed to establish a First Amendment violation. Glover argues that the Board's decision was in retaliation for his public statement concerning discrimination by the Board. There was some testimony to indicate that Board members were displeased with Glover's statements at the April hearing. The evidence revealed, however, that the portion of Glover's statement which upset the Board was the criticism of McEvoy rather than the charge of discrimination. Defendants contend that this aspect of Glover's speech is not protected speech for purposes of a First Amendment claim. *See Rahn,* 31 F.3d at 411. The Court need not decide whether any of Glover's comments at the April hearing or to the press constitute protected speech. Whether the speech was protected or not, the Court finds that Glover failed to show, as required, that the speech was a substantial or motivating factor in the Board's nonrenewal decision. *See Bailey,* 106 F.3d at 144. As explained above, the Court concludes that the Board discrimi-

nated against Glover because he is homosexual, but Glover failed to prove that his public complaint about discrimination was an additional factor in the Board's decision.

## IV. CONCLUSION

As explained above, the Court finds that Glover failed to prove that the nonrenewal decision was motivated by his gender, his partner's race, or his public statements. Thus, the following claims fail: the equal protection claims based on race and gender discrimination; the Ohio Civil Rights Act claim; and the First Amendment claim. Glover has established, however, his equal protection claim based upon sexual orientation discrimination. This claim was brought only against the Board and not defendants McEvoy and Campbell,[25] and thus the relief ordered in this case shall come from the Board.

The Court finds that reinstatement and compensatory damages are appropriate in this case. The Board's wrongful decision denied Glover the opportunity to teach at Williamsburg Elementary School in 1996–97 and 1997–98, and Glover has been unable to secure a permanent teaching job since the nonrenewal of his contract. Therefore, the Court hereby orders the Board to reinstate Glover as a full-time teacher at Williamsburg Elementary School with a two-year contract, beginning with the 1998–99 school year.

Glover is also hereby awarded compensatory damages for back pay as well as emotional distress. Glover introduced evidence that his salary at Williamsburg during 1996–97 and 1997–98 would have been $22,766 and 23,726, respectively. Although Glover has applied for many other teaching positions, he has been unable to secure another teaching job. The defendants did not establish that Glover failed to adequately mitigate these damages. *See Meyers v. City of Cincinnati,* 14 F.3d 1115 (6th Cir.1994) (stating that once plaintiff presents evidence of damages, the defendant

24. It is unclear whether Glover's claim of racial discrimination derives from the Equal Protection Clause or the First Amendment's protection of freedom of association. In either case, the claim fails for the same reason: a lack of evidence that Mr. Wright's race was a motivating factor in the Board's decision.

25. Although Glover initially brought this claim against McEvoy and Campbell, Glover moved for dismissal of this claim with respect to McEvoy and Campbell prior to trial. The motion was granted.

has the burden of establishing a failure to mitigate, which is established if substantially equivalent positions were available that the plaintiff failed to diligently seek). Therefore, he is entitled to the full amount of his lost salary for those two years, which amounts to $46,492.

Glover is also entitled to damages for mental and emotional distress. *See id.; Chatman v. Slagle,* 107 F.3d 380 (6th Cir.1997). After working diligently to establish a second career as a teacher, Glover had this career cut short by an unconstitutional decision of the Board. Glover testified that, as a result of the Board's wrongful actions, he has suffered considerable anguish as well as humiliation in the community. Glover's psychological injuries also had physical effects, including anxiety, sleeplessness, and digestive problems for which Glover has been receiving treatment since the Fall of 1996. The Court finds that $25,000 adequately compensates Glover for the mental anguish, emotional distress, humiliation, and loss of reputation he has suffered.

Therefore, the Court hereby **ORDERS** the Board to provide the following relief to Glover:

1) reinstatement as a full-time teacher at Williamsburg Elementary School with a two-year teaching contract, beginning in the 1998–99 school year;

2) compensatory damages in the amount of $71,492.00, which includes back pay and emotional distress; and

3) attorneys fees and costs.

If the parties are unable to agree on the amount of attorney fees, the plaintiff may file a motion for attorney's fees within the appropriate time limit.

**IT IS SO ORDERED.**