Wendy WEAVER, Plaintiff,

v.

NEBO SCHOOL DISTRICT, Robert Wadley, Almon Mosher, Larry Kimball, Denis Poulsen, and Does 1–10, Defendants.

No. 2:97–CV–819J.

United States District Court,
D. Utah,
Central Division.

Nov. 25, 1998.

Jennifer Middleton, Matt Coles, New York City, Stephen C. Clark, Salt Lake City, Utah, David B. Watkiss, Watkiss Dunning & Skordas, Salt Lake City, Utah, for plaintiff.

Martha S. Stonebrook, Utah Attorney General's Office, Salt Lake City, Utah, Robert C. Morton, Dunn & Dunn, Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

On September 18, 1998, the parties, each claiming that this action could be resolved by the court as a matter of law, filed their cross motions for summary judgment. Following full briefing, the motions were heard by the court on November 16, 1998. Jennifer Middleton, David B. Watkiss, and Steven C. Clark appeared on behalf of the plaintiff, Ms. Weaver; Martha S. Stonebrook and Robert C. Morton, Assistant Attorneys General for the State of Utah, appeared on behalf of the defendants. At the close of the hearing, the court reserved its decision on the parties' motions. Now, after reviewing the submitted motions and memoranda, and after hearing counsel's arguments, and for reasons discussed below, Ms. Weaver's Motion for Summary Judgment is granted and defendants' motion is denied.

### Factual Background

For the past nineteen years, plaintiff Wendy Weaver has been a teacher at Spanish Fork High School in the Nebo School District. Ms. Weaver, a tenured faculty member since 1982, teaches psychology and physical education. Her reputation as an educator at Spanish Fork is unblemished: she has always been considered an effective and capable teacher, her evaluations range from good to excellent, and she has never been the subject of any disciplinary action.

In addition to her teaching responsibilities, Ms. Weaver has served as the girl's volleyball coach since 1979. She has been effective in this endeavor, leading the team to four state championships.

Unlike her teaching position, however, Ms. Weaver's position as coach was not tenured. Instead, as is the case with all coaching positions at Spanish Fork High School, Ms. Weaver was hired as volleyball coach on a year-to-year basis. For each year she was hired as coach, Ms. Weaver received a stipend, which in her most recent year of coaching was $1,500. The practice of hiring coaches, however, is somewhat informal. It is the policy of the School District that Principal Wadley has final decision-making authority in selecting a coach. Generally, Principal Wadley finds out who has an interest, selects a coach from the interested candidates, and notifies the coach that he or she has the position. No written contract is prepared. In practice, the coach from the previous year is routinely offered the position for the following year, or, as Principal Wadley stated, "[y]ou assign them once and they stay assigned until you assign someone else."

During the 1995 and 1996 school years, Ms. Weaver did not coach the volleyball

team. With the consent of Principal Wadley, she took a break from her coaching duties to pursue a master's degree at the University of Utah. She did, however, anticipate a return to coaching in 1997, an anticipation she shared with Principal Wadley. In the spring of 1997, after completing her graduate work, Ms. Weaver again met with Principal Wadley and told him that she was prepared to return to coaching.

In the late spring and early summer of 1997, Ms. Weaver began preparing for the upcoming school volleyball season—as she did in the past—by organizing two summer volleyball camps for prospective team players. As usual, these camps were to be held at Spanish Fork High School in June and July of 1997. Ms. Weaver telephoned prospective volleyball team members to inform them of the camp schedules. One of the calls went to a senior team member. During the conversation, the team member asked Ms. Weaver. "Are you gay"?[1] Ms. Weaver truthfully responded, "Yes." The team member then told Ms. Weaver that she would not play on the volleyball team in the fall. On July 14, 1997, the team member and her parents met with defendants Almon Mosher, Director of Human Resources for the Nebo School District, and Larry Kimball, Director of Secondary Education for the Nebo School District, and told them that Ms. Weaver told them that she is gay and that the team member decided she would not play volleyball.

In April of 1997, Gary Weaver, Ms. Weaver's ex-husband and a school psychologist for the Nebo School District, spoke with Principal Wadley about Ms. Weaver's sexual orientation. In May of 1997, Nedra Call, the Curriculum Coordinator for the School District, received two calls concerning Ms. Weaver's "lifestyle and her actions." She related the substance of these calls to defendant Mosher. Defendant Dennis Poulsen, Superintendent of the Nebo School District, also received calls about Ms. Weaver. In addition, several adults affiliated or formerly affiliated with the school contacted Principal Wadley with comments or questions about

Ms. Weaver's sexual orientation. Principal Wadley held a meeting with his two assistant principals to discuss Ms. Weaver's sexual orientation. On May 22, 1997, before the phone conversation with Ms. Weaver, the team member and her mother telephoned Principal Wadley to let him know that the team member would not be playing volleyball because she was uncomfortable playing on the team knowing that Ms. Weaver is gay. On May 22nd, Principal Wadley discussed Ms. Weaver's sexual orientation with defendant Larry Kimball. Even the School Advisory Council wanted to discuss Ms. Weaver's sexual orientation.

In response to these reports, and after meeting again with the team member's family on July 14, 1997, defendants Mosher and Kimball discussed taking some action against Ms. Weaver because they felt Ms. Weaver's comments about her sexual orientation were in "violation of district policy." Several days later, on July 21, 1997, Ms. Weaver met with Principal Wadley, who informed her that she would not be assigned to coach volleyball for the 1997–98 school year. This discussion was memorialized in a letter to Ms. Weaver dated the same day but sent subsequently.

The following day, Ms. Weaver was called to a meeting at the School District office and presented a letter, printed on the School District letterhead, which reads in part:

> The District has received reports that you have made public and expressed to students your homosexual orientation and lifestyle. If these reports are true, we are concerned about the potential disruption in the school community and advise you of the following:
>
> —You are not to make any comments, announcements or statements to students, staff members, or parents of students regarding your homosexual orientation or lifestyle.
>
> —If students, staff members, or parents of students ask about your sexual orientation or anything concerning the subject, you shall tell them that the subject

1. The word "gay" is used in the vernacular of this age. A similar inquiry put in the Nineteenth Century would reflect an entirely different status or characteristic. In those days synonyms were, among others, lighthearted, blithe, airy, sprightly, vivacious, frolicsome, jolly, jovial, joyful, and glad.

is private and personal and inappropriate to discuss with them.

This memo is to place you on notice of the expectations the school district has for you concerning this matter. A violation of these requirements may jeopardize your job and be cause for termination.

The letter was drafted by defendant Mosher, signed by him and Larry Kimball, was reviewed by defendant Dennis Poulsen, delivered to Ms. Weaver, and placed in her personnel file.

On August 8, 1997, a similar letter was issued to Gary Weaver. It reads in part:

The District has received reports that you have made remarks within the school setting about your ex-wife's sexual orientation. If these reports are true we ··· advise you of the following:

▸ You are not to make comments, announcements or statements to students, staff members, or parents regarding your ex-wife's sexual orientation.

▸ If students, staff members or parents of students ask about your ex-wife's sexual orientation, you shall tell them the subject is private and personal and inappropriate to discuss with them.

This memo is to place you on notice of the expectations the school district has for you concerning this matter. A violation of these requirements may jeopardize your job and be cause for termination.

This letter was delivered to Mr. Weaver and placed in his personnel file.

On October 20, 1997, Ms. Weaver commenced an action in this court under 42 U.S.C. § 1983 challenging the restraints on her speech contained in the July 22 letter as well as her removal as volleyball coach. Nine days after the action was filed, the School District delivered another letter to Ms. Weaver, to "clarify" the July 22 letter. In part, the October 29, 1997 letter reads:

The District's intent with the July 22 letter was that the foregoing restrictions [contained in the July 22 letter] on your communications apply only while you are acting within the course and scope of your duties as a teacher for the District. Our main areas of concern are situations such as classroom teaching, extracurricular school-sponsored activities and parent-teacher conferences where, we believe, discussion of one's sexual orientation would be inappropriate. We believed that this intent was apparent in the July 22 letter from the fact that it was written on District stationary and addressed the issue of "disruption in the school community."

As further clarification of the July 22 letter, we strongly encourage you to avoid discussions of the foregoing matters at any time with students because we believe that in virtually any interaction you have with a student, including off-campus contacts, you are always perceived by the student as a teacher, authority figure and role model.

The letter, printed on the School District's letterhead, was signed by defendants Mosher and Kimball, and like the July 22 letter, placed in Ms. Weaver's personnel file.

## Discussion

Ms. Weaver makes the following claims:

1. The letters dated July 22 and October 29 directed to her, and particularly the restrictions on speech contained therein, are vague and overbroad and restrain constitutionally protected speech.

2. Her removal as volleyball coach was based on an impermissible reason—namely sexual orientation—and thus violates the Fourteenth Amendment of the United States Constitution.

Ms. Weaver has moved for summary judgment on these claims. The defendants have cross-moved for summary judgment. In their motion for summary judgment and in their opposition to plaintiff's motion, the defendants assert that there are no issues of material fact that would prevent the court from ruling on either motion. Indeed, the defendants do not contest the operative facts that plaintiff has set forth. Rather, the defendants assert that under those facts they are entitled to summary judgment. Thus, because there is no genuine issue of material fact, the court is in a position to apply the law to the facts as presented in the motions. *See* Fed.R.Civ.P. 56(c); DUCivR 56–1(c).

## I

Much of this case is controlled by the interpretation of a phrase drafted some 209 years ago that is the keystone of freedom. In language now famous, the First Amendment states: "Congress shall make no law . . . abridging the freedom of speech. . . ."[2] Although early interpretations of this language did little to protect unpopular speech, see *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), and *Abrams v. United States,* 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (finding public attacks on capitalism were without First Amendment protection), since then, the First Amendment has been interpreted to insulate citizens from government sanction or restraint for speaking out on unpopular or even hateful ideas, see *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (prohibiting the conviction of a Ku Klux Klan leader for advocating violence as a means of political reform), morally revolting ideas, see *Hustler v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (protecting a parody that suggested that Reverend Falwell had a sexual relationship with his mother in an outhouse), offensive language, see *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (protecting expressive conduct of a person who wore a leather jacket in a United States courthouse that bore a message on the back that challenged the draft using a "scurrilous [and profane] epithet"), and, what to some, may be unpopular conduct. *See Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (protecting students right to wear black arm bands in class as a protest to the Vietnam conflict) and *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (protecting the right to burn the American flag as a form of protest). These High Court decisions point out that there are areas of personal freedom so important they are said to be inalienable. The First Amendment is the barrier that precludes government, at any level, from taking from a person rights one cannot give away. Thus, the debate on public issues should "be uninhibited, robust and wide-open." *See New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Guided by these general principles, the court turns to the questions presented in this case.

Both sides agree that because of the uniqueness of a high school environment, and the existence of a School District "Healthy Responsible Lifestyles Education" policy, Ms. Weaver may not speak about her sexual orientation in the classroom. Instead, what the dispute centers on is whether the School District's restrictions go beyond the classroom and unconstitutionally infringe on Ms. Weaver's right to speak in public.

■ Because Ms. Weaver, in her role as teacher and coach, is a public employee, the appropriate measure of whether the School District's restrictions violate the First Amendment is found in a two-step analysis set forth in *Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The first step in this analysis is whether the employee's speech or actions, whether inside or outside the workplace, address a matter of public concern or are otherwise protected under the First Amendment. *See id.* at 568, 88 S.Ct. 1731; *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the first step is satisfied, the court must then balance the employee's interest in commenting on matters of public concern

---

**2.** The complete text of the First Amendment reads:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

*U.S. Const. amend. I.*

The First Amendment, of course, is made applicable to the States by the Due Process Clause of the Fourteenth Amendment. *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 52 n.

1, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Whitney v. California,* 274 U.S. 357, 371, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). When this opinion refers to the First Amendment or a First Amendment violation, it is of course referring to it in this sense.

with the government's interest, as an employer, in promoting workplace efficiency. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. If the "government's interests" do not outweigh the "employee's interests," then any restriction on employee speech violates the First Amendment. *See id.* Thus, if Ms. Weaver's speech about her sexual orientation is matter of "public concern," it may not be restricted off the job unless the School District can show that her speech adversely affects the functioning of the school.

Additional High Court guidance on speech restrictions in a school setting is provided by *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Under *Tinker,* speech made outside a school-sponsored activity, such as a school newspaper, a classroom discussion, or an assembly, may not be restricted unless it is shown that the speech "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 509, 89 S.Ct. 733; *see also National Gay Task Force v. Board of Educ. of the City of Oklahoma City,* 729 F.2d 1270, 1274 (10th Cir.1984) (citing *Tinker* and noting that the state's interest outweigh a teacher's interest in publicly speaking about sexual orientation only "when the expression results in a material or substantial interference or disruption in the normal activities of the school"), *aff'd by an equally divided Court,* 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985).

■ Defendants assert that Ms. Weaver's First Amendment claim must fail because she cannot meet the first requirement of *Pickering* —that is, she cannot demonstrate that her sexual orientation is a matter of public concern. Certain issues may be considered "inherently of public concern." *See Connick,* 461 U.S. at 148, n. 8, 103 S.Ct. 1684. (noting racial discrimination as one example). Several legal authorities have suggested that one's identity as a homosexual—even though it is in essence a private matter—is inherently a matter of public concern because it "necessarily and ineluctably" involves that person in the ongoing public debate regarding the rights of homosexuals. *See, e.g.,*

*Rowland v. Mad River Local School District, Montgomery County, Ohio,* 470 U.S. 1009, 1012, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of certiorari). Thus, it could be said that a voluntary "coming out" or an involuntary "outing" of a gay, lesbian, or bisexual teacher would always be a matter of public concern.[3] Indeed, the public reaction in the Nebo School District to the rumors about Ms. Weaver's sexual orientation clearly evidence public concern over her sexual orientation.

Even if Ms. Weaver's statement about her sexual orientation in response to a question is not viewed as a matter of public concern, the actions of the defendants—taken before Ms. Weaver ever spoke on the topic—transmuted what should have been a private issue into a matter of public concern. First, Ms. Weaver's ex-husband began publicly disclosing her sexual orientation in April 1997. He spoke with several of the faculty members of the School District and with Principal Wadley. These comments apparently reached members of the community, who then called Principal Wadley. One community member (who was also a former staff member at Spanish Fork High School) called after purportedly seeing Ms. Weaver and her companion walking arm-in-arm at a community softball game. In addition, Principal Wadley discussed Ms. Weaver's sexual orientation at a meeting with his assistant principals. He also spoke with School District Director Kimball regarding the rumors of Ms. Weaver's sexual orientation. And, finally, the School Advisory Council wanted to discuss Ms. Weaver's sexuality at a public meeting. Each of these events pre-date the telephone call in June of 1997 when Ms. Weaver first mentioned, in a private conversation, that she was a lesbian. Thus, even if a Utah County public school teacher's status as a lesbian could ever be considered a matter of private concern—as defendants unpersuasively argue—defendants' actions converted this issue to a matter of public concern.

■ Turning to the second step, the court must next determine whether the School Dis-

---

**3.** The court notes that the recent public debate concerning the sexual orientation of a candidate for Utah state legislature supports a conclusion that, in Utah at least, questions on this topic are almost always construed as matters of public concern.

trict's "interests" outweigh Ms. Weaver's "interests" in acknowledging her sexual orientation and living her life openly as a lesbian. The School District must demonstrate that allowing Ms. Weaver to speak about her sexual orientation would result in a "material and substantial interference or disruption" in the normal activities of the school. *See Tinker,* 393 U.S. at 509, 89 S.Ct. 733; *National Gay Task Force,* 729 F.2d at 1274.

It is clear to this court that on this record no such showing has been made nor can be made.

The defendants point to the several inquiries and complaints they received from some members of the community regarding Ms. Weaver's sexual orientation as evidence of a sufficient "disruption" to justify its efforts to restrict Ms. Weaver's speech. As the record now stands, however, it cannot be said that "her speech" caused a material or substantial disruption. As counsel for Ms. Weaver aptly noted, one of the duties a school administrator undertakes is the handling of student, faculty, parent, and community complaints. Ms. Weaver continued to teach her classes without any problems. Indeed, the defendants have been unable to point to any actual disruptive events since Ms. Weaver's sexual orientation became public knowledge.

The statement from a student and volleyball team member that she felt uncomfortable about playing for Ms. Weaver, and that she would not play volleyball in her senior year, is just that. While this student's actions may have interrupted her own activities, there is no evidence that the activities of the school were in any way disrupted. It

cannot be said that a single student's decision not to take part in a wholly voluntary extracurricular activity can support a showing of a "material and substantial" disruption in the school's activities. See *National Gay Task Force,* 729 F.2d at 1274.[4]

Thus, because the record makes clear that Ms. Weaver's right to express her sexual orientation outside the classroom would not, and indeed did not, result in a material or substantial disruption in the school, to the extent the July 22 and October 29 letters limit her speech in this area, they violate the First Amendment.

Turning first to the July 22 letter. As drafted by defendant Mosher, the letter prohibits Ms. Weaver from discussing her "homosexual orientation and lifestyle." It advises her that she could be terminated from her teaching position if she makes any comments to "students, staff members, or parents of students regarding [her] homosexual orientation or lifestyle." She could also be terminated for responding to questions concerning her "sexual orientation or anything concerning the subject."

The July 22 letter does not limit these restrictions to speech made in the classroom or during any school-sponsored functions—a limitation that all parties' now seem to agree would be reasonable. Instead, these restrictions limit Ms. Weaver's ability to speak on her sexuality outside of the school, as, for example, when meeting a parent of a student in the supermarket, or when speaking at dinner with a friend who may be a staff member at the school, or even when speaking

---

4. A recent decision from the Court of Appeals for the Seventh Circuit helps clarify just how disruptive the speech must be to support an infringement. *See Weicherding v. Riegel,* 160 F.3d 1139, 1998 WL 774821 (7th Cir.1998). In *Weicherding,* the plaintiff, a former Illinois state prison guard, claimed his First Amendment rights were violated when he was fired after the prison discovered that he was a member of the Ku Klux Klan and the Aryan Nation. The plaintiff publicly announced his affiliation with the Klan and actively promoted a Klan rally while working in the state prison. Plaintiff also wore a watch with the Aryan Nation flag on its face while working at the prison and discussed Aryan Nation topics with inmates. *Id.* at 1141.

On these facts, the court had no trouble concluding that under the *Pickering* balancing test,

the state was entitled to dismiss the plaintiff. Specifically, the court noted that because the prison is a "racially charged environment," avoiding racially motivated violence is essential to the efficient operation of the prison. Further, the court noted that if the prison were viewed as tolerating the racists views of the Klan, there would be an increased risk to all staff at the prison, especially the plaintiff. Moreover, racial tensions within the prison would be "exacerbated." *Id.* at 1143. Under these circumstances, the court concluded that the state's interest in avoiding racial violence and maintaining safety outweighed the plaintiff's interest in associating with the Klan. Therefore, the court concluded that the state's dismissal of the plaintiff was not unconstitutional.

with her own children, who are students in the School District. Moreover, under the broad restrictions contained in the July 22 letter, Ms. Weaver could violate its terms if she is spotted by some student, parent, or staff member while walking hand-in-hand with another in the seclusion of her own yard. By restricting Ms. Weaver's speech outside the classroom, these restrictions are unconstitutionally overbroad. *See National Gay Task Force,* 729 F.2d at 1273–74 (holding that a statute that punished teachers for "advocating," "promoting," or "encouraging" homosexuality outside the classroom was unconstitutionally overbroad).

The School District's October 29 letter that "clarifies" the speech restrictions on Ms. Weaver does not change this result. First, the October 29 letter does not retract the July 22 letter. Both letters remain in Ms. Weaver's personnel file. Nor does the October 29 letter sufficiently narrow the July 22 letter. Rather, the October 29 letter remains overbroad in that it seeks to restrict Ms. Weaver's right to speak "at any time with students" and in "virtually any interaction ... including off-campus contacts...." As with the July 22 letter, the October 29 letter also reaches protected activities, and thus is unconstitutionally overbroad.

Moreover, the restrictions in both letters remain vague. Even the author of the letters, defendant Mosher, was unable to describe with certainty in what situations Ms. Weaver could freely speak and in what situations she could not. Under these circumstances, Ms. Weaver should not be called upon to self-censor her speech so that her speech is limited to that "which is unquestionably safe." *Bagget v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Because Ms. Weaver is left to guess at what speech might subject her to termination, the letters are impermissibly vague. *See Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); *see also Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (declaring that a law will be void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application") (citation omitted).

Notably, it was only Ms. Weaver who received a letter restricting her speech. The School District concedes that no other teachers have received such a letter limiting their speech on matters of sexual orientation. The only other School District employee who received a similar restriction was Ms. Weaver's ex-husband. Tellingly, however, his letter prohibited only the discussion of Ms. Weaver's sexual orientation, not his own. Indeed, the School District, via its Healthy Responsible Lifestyles Education policy, recognizes and encourages teachers to speak freely on issues concerning heterosexual lifestyles. (*See* policy at 1 (allowing the curriculum to include, among other things, information "that promotes the importance of marriage and the family" and information that promotes "sexual abstinence before marriage and fidelity within marriage.")). Because the restrictions imposed on Ms. Weaver (and her ex-husband) only targeted speech concerning homosexual orientation and not heterosexual orientation, the restrictions are properly considered viewpoint restrictions. Such a one-sided approach to sexual orientation is classic viewpoint discrimination and is "presumptively invalid." *See R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

■ Generally, if a state regulation is viewpoint-based, it will be deemed unconstitutional unless the state can show that it has a compelling state interest in restricting the content of the speech and that the restriction is narrowly tailored to achieve that end. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The absence of such a showing here provides further support for concluding that the July 22 and October 29 letters violate Ms. Weaver's First Amendment rights.

In sum, because both the July 22 and the October 29 letters impermissibly infringe on Ms. Weaver's First Amendment rights, Ms. Weaver is entitled to summary judgment on her First Amendment claim. Moreover, because the letters violate Ms. Weaver's constitutional rights so long as they remain extant and in her personnel file, they are void and must be removed from her personnel file.

## II

Despite mounting evidence that gay males and lesbians suffer from employment discrimination and, as recent events in Wyoming remind us, other more life-threatening expressions of bias,[5] courts, including the Supreme Court, have not yet recognized a person's sexual orientation as a status that deserves heightened protection. To date, Congress has expressly prohibited employment discrimination on the basis of race, religion, national origin, gender, age, and disability, but not sexual orientation.[6] As of this year, eleven states and the District of Columbia offer statutory protection against discrimination on the basis of sexual orientation;[7] thirty-nine states, including Utah, do not.[8]

■ Nevertheless, the Fourteenth Amendment of the United States Constitution entitles all persons to equal protection under the law. *See* U.S. Const. amend. XIV. It appears that the plain language of the Fourteenth Amendment's Equal Protection Clause prohibits a state government or agency from engaging in intentional discrimination—even on the basis of sexual orientation—absent some rational basis for so doing.

The Supreme Court has recognized that an "irrational prejudice" cannot provide the rational basis to support a state action against an equal protection challenge. In *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court reviewed whether a local ordinance that required a special use permit for homes for the mentally retarded, but not for nursing homes, apartment houses, dormitories, hospitals, and similar multiple occupant dwellings, violated the Equal Protection Clause. Even under rational basis review, the Court had no trouble concluding that the ordinance did indeed violate the Equal Protection Clause. The Court began its rational basis review by stating that "a bare ... desire to harm a politically unpopular group" is not a legitimate state interest. *Id.* at 446–47, 105 S.Ct. 3249 (quoting *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). Indeed, the Court noted that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in [the circumstances], are not permissible bases" for differential treatment by the government. *Id.* at 448, 105 S.Ct. 3249. Because no special use permit was required of other similar uses in the same neighborhood, the Court concluded that the permit requirement rested on an "irrational prejudice against the mentally retarded" and therefore violated the Fourteenth Amendment. *Id.* at 448–50, 105 S.Ct. 3249.

Other Supreme Court precedents have similarly recognized that when state action reflects an animus directed at a defined minority, it cannot be supported under the Equal Protection Clause. *See, e.g., Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (noting that the Equal Protection Clause grants all Americans the "right to be free from invidious discrimina-

**5.** The deep-seated prejudice on the part of some persons against the gay and lesbian community can be summed up in a single quote from ardent anti-gay activist and former entertainer Anita Bryant: "I'd rather my child be dead than be a homosexual." *See* "Millie Ball, I'd Rather My Child be Dead Than Homo," The Times–Picayune, June 19, 1977, at 3 (quoting Ms. Bryant).

**6.** *See, e.g.,* 42 U.S.C. § 2000e–2 (prohibiting employment discrimination based on race, religion, sex, or national origin); 29 U.S.C. § 623(a) (same for age); 42 U.S.C. § 12112 (same for disability).

**7.** *See* Cal.Lab.Code § 1102.1 (West Supp.1997); Conn.Gen.Stat.Ann. § 46a–81(c) (West 1995); D.C.Code §§ 1–2501 to 1–2557 (Michie 1991 and Supp.1997); Haw.Rev.Stat.Ann. § 378–2 (Michie Supp.1996); Mass.Gen.Laws Ann. ch. 151B, § 4 (West 1996); Minn.Stat.Ann. § 363.03 (West Supp.1997); N.H.Stat.Ann. § 21–I:52(I) (West 1998); N.J.Stat.Ann. § 10:5–12 (West Supp..1995); R.I.GenLaws § 28–5–3 (1997); Vt. Stat.Ann. tit. 21, § 495 (Supp..1997); Wis.Stat. Ann. § 111.36 (West 1997).

**8.** Recently, the Salt Lake City City Council passed an anti-discrimination ordinance aimed at broadening employment protections for homosexuals by focusing on "job relatedness." The new ordinance states that City employees may only be judged on "job-related criteria" and specifically notes that "the status of having a lifestyle which is irrelevant to successful job performance is not a job-related criteria." *See* Alan Edwards, Skateboard Ban Overshadows 2 Other Controversial S.L.Laws, Deseret News, at B2 (Nov. 18, 1998).

tion in statutory classifications and other governmental activity"); *New York Transit Authority v. Beazer*, 440 U.S. 568, 593 n. 40, 99 S.Ct. 1355, 59 L.Ed.2d 587 (noting that the Court's equal protection cases have recognized a distinction between " 'invidious discrimination'—i.e., classifications drawn 'with an evil eye and an unequal hand' or motivated by 'a feeling of antipathy' against, a specific group of residents"—and other even-handed classifications) (quotations omitted).

More recently, in *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), the Court was called upon to examine whether an amendment to Colorado's state constitution, prohibiting any legislation or judicial action designed to protect the status of a person based on sexual orientation violated the Fourteenth Amendment. It had no trouble finding that it did. In *Romer*, the Court noted that under the ordinary deferential equal protection standard—that is, rational basis—the Court would "insist on knowing the relation between the classification adopted and the object to be obtained." *Id.* at 632, 116 S.Ct. 1620. It is this search for a "link" between classification and objective, noted the Court, that "gives substance to the Equal Protection Clause." *Id.* In *Romer*, such a "link" was noticeably absent. Noting that the "inevitable inference" that arises from a law of this sort is that it is "born of animosity toward the class of persons affected," *id.* at 634, 116 S.Ct. 1620, the Court described the amendment as "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.* at 635, 116 S.Ct. 1620.

Several courts of appeal have recently considered the question of equal protection and sexual orientation and applied the same rational basis test the Supreme Court announced in *Romer*. These cases, which dealt with the constitutionality of the military's current "Don't Ask, Don't Tell" policy, examined whether the forced separation from service of a person who engages in a homosexual act or who states that he or she is a homosexual violates the Equal Protection Clause. In holding that the policy did not violate the Equal Protection Clause, these courts relied on the uniqueness of the military setting and the deference accorded military decisions. *See Able v. United States*, 155 F.3d 628, 632–35 (2d. Cir.1998); *Holmes v. California Army National Guard*, 124 F.3d 1126, 1132–1136 (9th Cir.1997), *petition for cert. filed*, 67 U.S.L.W. 3240 (July 6, 1998); *Richenberg v. Perry*, 97 F.3d 256, 260–61 (8th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 45, 139 L.Ed.2d 12 (1997); *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989). Nevertheless, like the Supreme Court in *City of Cleburne* and *Romer*, these courts also recognized that government action in a civil rather than a military setting cannot survive a rational basis review when it is motivated by irrational fear and prejudice towards homosexuals. *See, e.g., Able*, 155 F.3d at 634–35 (citing *City of Cleburne*, 473 U.S. at 448, 105 S.Ct. 3249).

When faced with equal protection challenges on the basis of sexual orientation in other contexts, the lower courts have also reviewed the challenged state action under a rational basis standard. *See Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997) (noting that selective prosecution on basis of sexual orientation violates the Equal Protection Clause), *cert. denied,* —— U.S. ——, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998); *Nabozny v. Podlesny*, 92 F.3d 446, 456–58 (concluding that school district violated the Equal Protection Clause when it discriminated against a student on basis of his sexual orientation); *Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir.1992) (agreeing that rational basis review should be applied to classifications based on sexual orientation); *National Gay Task Force*, 729 F.2d at 1273 (same); *Glover v. Williamsburg Local Sch. Dist. Bd. of Educ.*, 20 F.Supp.2d 1160, 1168–1174, 1998 WL 612869 (S.D.Ohio 1998) (applying rational basis review and finding that the decision not to rehire a non-tenured teacher based solely on his sexual orientation violated the Equal Protection Clause).

■ The question then is whether bias concerning Ms. Weaver's sexual orientation furnishes a rational basis for the defendants' decision not to assign her as volleyball coach. The "negative reaction" some members of

the community may have to homosexuals is not a proper basis for discriminating against them. So reasoned the Supreme Court in the context of race. *See, e.g., Brown v. Board of Educ.*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (declaring that racial school segregation is unconstitutional despite the widespread acceptance of the practice in the community and in the country). If the community's perception is based on nothing more than unsupported assumptions, outdated stereotypes, and animosity, it is necessarily irrational and under *Romer* and other Supreme Court precedent, it provides no legitimate support for the School District's decisions. *See also Jantz v. Muci*, 759 F.Supp. 1543, 1548–49, 1551 (D.Kan.1991) (describing discrimination, prejudice, and stereotypes that haunt homosexuals and finding that a principal's refusal to hire a teacher on the basis of the teacher's sexual orientation was an arbitrary and capricious action that violated the Equal Protection Clause), *rev'd on other grounds*, 976 F.2d 623 (10th Cir.1992).

The record now before the court contains no job-related justification for not assigning Ms. Weaver as volleyball coach. Nor have the defendants demonstrated how Ms. Weaver's sexual orientation bears any rational relationship to her competency as teacher or coach, or her job performance as coach—a position she has held for many years with distinction. As mentioned earlier, it is undisputed that she was an excellent coach and apparently, up until the time her sexual orientation was revealed, the likely candidate for the position. Principal Wadley's decision not to assign Ms. Weaver (a decision reached after consulting with the other defendants) was based solely on her sexual orientation. Absent some rational relationship to job performance, a decision not to assign Ms. Weaver as coach because of her sexual orientation runs afoul of the Fourteenth Amendment's equal protection guarantee.

Although the Constitution cannot control prejudices, neither this court nor any other court should, directly or indirectly, legitimize them. *See City of Cleburne*, 473 U.S. at 448, 105 S.Ct. 3249; *Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). Indeed, as the Supreme Court has recently admonished, " '[i]f the constitutional conception of "equal protection of the laws"

means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.' " *Romer*, 517 U.S. at 634, 116 S.Ct. 1620 (quoting *Moreno*, 413 U.S. at 534, 93 S.Ct. 2821). Nor can public officials avoid their constitutional duty by "bowing to the hypothetical effects of private ... prejudice that they assume to be both widely and deeply held." *Palmore*, 466 U.S. at 433, 104 S.Ct. 1879 (quotation omitted). Simply put, the private antipathy of some members of a community cannot validate state discrimination. *See City of Cleburne*, 473 U.S. at 448, 105 S.Ct. 3249. Because a community's animus towards homosexuals can never serve as a legitimate basis for state action, the defendants' actions based on that animus violate the Equal Protection Clause. *See Romer*, 517 U.S. at 634, 116 S.Ct. 1620; *City of Cleburne*, 473 U.S. at 448–50, 105 S.Ct. 3249; *Stemler*, 126 F.3d at 874.

Even though there remains a question of fact as to whether or not Ms. Weaver had already been assigned as volleyball coach before she was told by Principal Wadley that she would not fill the position for 1997–98, this disputed issue is not material. The defendants have failed to advance any justification for not assigning Ms. Weaver as volleyball coach other than that there was "negative" reaction in the community. Because this perceived negative reaction arose solely from Ms. Weaver's sexual orientation, and not from her abilities as coach, it does not furnish a rational job-related basis for the defendants' decision. Therefore, Ms. Weaver's Motion for Summary Judgment is granted as to this claim.

### III

■ In Ms. Weaver's second equal protection claim, she asserts that the defendants violated her rights to equal protection by imposing a viewpoint and content-based restriction on her speech. She argues that she was prohibited from discussing her sexual orientation only because she would have discussed her homosexuality, and points out that other teachers were free to discuss their heterosexual orientations.

Ms. Weaver was threatened with disciplinary action for discussing her intimate associations and sexual orientation. At the same time, no other teacher in the School District was prohibited from discussing these topics. Indeed, as the School District conceded at the hearing, no similar restriction was placed on heterosexual teachers at all. Clearly then, the School District wanted to silence Ms. Weaver's speech because of its expected pro-homosexual viewpoint. Such viewpoint-based restriction is constitutionally imper-. missible.

■ Simple as it may sound, as a matter of fairness and evenhandedness, homosexuals should not be sanctioned or restricted for speech that heterosexuals are not likewise sanctioned or restricted for. Because the School District has not restricted other teachers in speaking out on their sexual orientation, the School District has not only violated the First Amendment, but also the Fourteenth Amendment's Equal Protection Clause. In such an instance, when an equal protection claim is based on a person's exercise of a fundamental constitutional right, the proper standard of review is strict scrutiny—that is, is the restriction supported by a compelling state interest? *See City of Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249; *Phyler v. Doe,* 457 U.S. 202, 217 n. 15, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Because the Court has concluded that the School District's actions cannot be supported on any rational basis, the District's actions obviously fail the strict scrutiny test. Ms. Weaver is granted summary judgment on this claim as well.

## IV

■ A corollary to Ms. Weaver's First Amendment claim is a claim that the Principal's decision not to assign her as volleyball coach constituted retaliation against her for exercising her First Amendment right to speak on matters of public concern, in this case giving truthful answers to questions concerning her sexual orientation.

■ As impermissible as it is to restrict a state employee's right to speak on a matter of public concern, it is equally impermissible to retaliate against that employee when he or she does indeed speak on a matter of public concern. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To prevail on such a claim, Ms. Weaver must demonstrate two things. First, that her speech was constitutionally protected. A showing that her speech was on a matter of public concern and that her interest in speaking outweighed the School District's interest in workplace efficiency will satisfy this burden. *Id.* at 284, 97 S.Ct. 568 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). Next, she must demonstrate that her speech was a "substantial" or "motivating" factor in the Principal's decision. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568.

This Court has already concluded that Ms. Weaver has satisfied the first part of this test. (*See* Part I, *supra.*) Thus, in order to prevail on a retaliation claim, Ms. Weaver must demonstrate that her public statements concerning her sexual orientation were a "substantial" or "motivating" factor in the Principal's decision not to assign her as volleyball coach.[9]

The record now before this Court indicates that the only reason Ms. Weaver was not assigned the position as volleyball coach was her public disclosure of her status as a lesbian and the perceived reaction of some community members thereto. The record is bereft of any other justification for the School District's decision. Rather, the record evidence indicates that she was (and likely still is) an excellent coach. Tellingly, when asked about why he did not assign Ms. Weaver as

9. Even though a dispute of fact remains as to whether Ms. Weaver had already assumed the position as volleyball coach or had not yet been assigned, a dispute on that issue would not be dispositive on a retaliation claim. *See Mt. Healthy,* 429 U.S. at 283–84, 97 S.Ct. 568. If Ms. Weaver can successfully demonstrate that she was not assigned to coach volleyball because she exercised her constitutionally protected First Amendment freedoms, she would be entitled to reinstatement as coach regardless of whether she had already been assigned or not. *Id.* (recognizing that although a non-tenured teacher could be dismissed for any reason, he would be entitled to reinstatement if he prevailed on retaliation claim) (citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

 

coach, Principal Wadley noted it was because of the "negative reaction" of the community:

> PRINCIPAL WADLEY: Wendy became—within a very short period of time, Wendy became a very controversial person in our community.... And so Wendy went within a fairly short period of time, she became divorced from her husband and moved in with a woman and announced—you know, public announcement, it became known that she had declared that she was a lesbian. She became a very controversial person in town. And the reaction to that was generally negative.
>
> Q: And that was what you were responding to [when deciding not to assign Ms. Weaver as coach]?
>
> PRINCIPAL WADLEY: That's what we were responding to, yes.

(Deposition of Robert Wadley, attached as Ex. C. to Def.Mot. for Summ.J., at pp. 71–72.) On this record it seems clear that the School District's response to Ms. Weaver's public expression of her sexual orientation was a decision not to assign her as volleyball coach. This sort of retaliatory action is unconstitutional.[10] *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568.

### V

It is not disputed that Principal Wadley, in his official position as principal for Spanish Fork High School, had final authority to assign Ms. Weaver as volleyball coach. It is equally clear that Director Mosher had final authority to send the July 22 and October 29 letters to Ms. Weaver. Thus, if it is found that these decisions were based on constitutionally impermissible grounds, the School District may be liable for money damages. *See Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

There is no contest that the actions of the individual defendants were taken on the behest of, and ratified by, the School District.

In granting Ms. Weaver's Motion for Summary Judgment against the School District, her relief is complete. No additional relief need be granted as against the individual defendants. Undoubtedly, it is the School District that will be called upon to remove the July 22 and October 29 letters from Ms. Weaver's personnel file, offer her the position as volleyball coach, and pay her coaching stipend. Thus, it is simply unnecessary to determine whether the individual defendants knowingly violated Ms. Weaver's clearly established constitutional rights. The fact that the School District has done so is enough.

### Conclusion

For the foregoing reasons,

IT IS ORDERED that plaintiff's Motion for Summary Judgment is GRANTED and defendants' motion is DENIED.

IT IS FURTHER ORDERED that the School District shall remove the July 22 and October 29 letters from plaintiff's personnel file.

IT IS FURTHER ORDERED that the School District is directed to offer the plaintiff the Spanish Fork High School girl's volleyball coaching position for the 1999–2000 school year.

IT IS FURTHER ORDERED that the School District pay damages to the plaintiff in the sum of $1,500.

The Clerk of the Court is directed to enter judgment accordingly.

---

**10.** It also appears from the pleadings that Ms. Weaver may also have a freedom of association claim. To the extent the School District may be punishing Ms. Weaver by not assigning her as volleyball coach because of her private relationship with another woman, this action is unconstitutional. *See Owens v. Rush*, 654 F.2d 1370, 1379 (10th Cir.1981) (holding that husband's private activities in support of his wife were protect-

ed activities and the discharge of the husband for such activities would be unconstitutional); *LaSota v. Town of Topsfield*, 979 F.Supp. 45, 50–51 (D.Mass.1997) (finding that a non-tenured teacher who was rehired because she was living with a man stated a claim under the Fourteenth Amendment because the school's decision violated her right to intimate association).